# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 8971 | **DATE** | 9/17/2003 |
| **CASE TITLE** | Mantia vs. The Great Books Foundation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
      ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment [30-1] is denied. Trial is set for 1/26/04 at 10:00 a.m. Final pretrial materials shall be submitted to chambers by 11/1/03. Final pretrial conference is set for 1/16/04.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 number of notices | Document Number |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | SEP 18 2003 date docketed | 55 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 9/17/2003 date mailed notice | |
| MD | courtroom deputy's initials | 03 SEP 18 AM 8:16 Date/time received in central Clerk's Office | MD mailing deputy initials | |

Minute Order Form (06/97)

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

DOCKETED
SEP 1 8 2003

DEBORAH MANTIA,  )
 )
Plaintiff,  )
 )
v.  ) No. 01 C 8971
 ) Judge Joan H. Lefkow
THE GREAT BOOKS FOUNDATION,  )
 )
Defendant.  )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Deborah Mantia,[1] has filed a one-count complaint against defendant, The Great Books Foundation ("TGBF"), alleging age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.* Before this court is TGBF's motion for summary judgment. The court has jurisdiction over the claims pursuant to 29 U.S.C. § 626 and 28 U.S.C. § 1337. For the reasons stated herein, the court denies the motion.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c) Advisory Committee's notes. The

---

[1] Hereinafter, last names will be used in subsequent references to individuals.

55

party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court must apply the summary judgment standard with "added rigor" in employment discrimination cases, where intent is the central issue. *Kralman v. Illinois Dept. of Veterans' Affairs*, 23 F.3d 150, 152 (7th Cir. 1994).

## FACTS STATED IN A LIGHT MOST FAVORABLE TO THE PLAINTIFF

### A. Background

TGBF is a not-for-profit educational corporation that provides texts and training in discussion methods to people of all ages. The core of TGBF's offerings is the Junior Great Books ("JGB") program for schools. TGBF has a sales department, which is primarily responsible for marketing the JGB program to schools and school districts, a training department responsible for training teachers, administrators, and volunteers, and an editorial department. As of the beginning of 2000, TGBF had approximately seventy employees. (Pl. L.R. 56.1 ¶ 1.)

2

## B. Mantia's Work at TGBF

Mantia, who was fifty-three years old in 2001, began working for TGBF in 1984 as a training instructor. (Pl. L.R. 56.1 ¶ 6.) After two years, she was promoted to coordinator of promotions. In that position, Ms. Mantia marketed the JGB program throughout the country while also organizing and hiring the staff for TGBF's first sales department. (Pl. L.R. 56.1 ¶ 7.)

In 1995, Mantia became TGBF's senior representative. (Pl. L.R. 56.1 ¶ 9.) As senior representative, Mantia cultivated relationships with major school districts and educational organizations and used feedback from those contacts to help TGBF improve and develop its products. Mantia served as senior representative until mid-2000 when she became Director of Programs for Schools. (*Id.*) Beginning in 1988 when she was coordinator of promotions, and in all subsequent positions, Mantia reported directly to TGBF's president. (Pl. L.R. 56.1 ¶ 8.)

Until 1999, TGBF's president was Alice Letvin. (Pl. L.R. 56.1 ¶ 2.) In 1998, Letvin evaluated Mantia's performance as senior representative as "outstanding." The 1998 performance evaluation contained no criticism or Mantia's performance or her work relationships. (Pl. L.R. 56.1 ¶ 11.) Letvin rewarded Mantia's performance with a $2500 bonus. From 1995 to 2000, only two employees received larger bonuses, and the vast majority of TGBF's staff received no merit-based bonuses. (Pl. L.R. 56.1 ¶ 12.)

After Letvin left TGBF in 1999, George Schueppert, previously a board member, became interim president while TGBF undertook a nationwide search for a new president. (Pl. L.R. 56.1 ¶ 2.) Schueppert described Mantia as a "person of a variety of talents . . . bright, articulate, she could synthesize." He also noted her "intelligence and . . . communicative skills." Schueppert recognized that Mantia was one of the only staff members who "could see the wider impact of

3

the Foundation's offerings and the possible expansion of its mission." (Pl. L.R. 56.1 ¶ 10.) Schueppert selected Mantia as one of six employees to interview candidates for president. (Pl. L.R. 56.1 ¶ 18.)

Peter Temes was hired as TGBF president around February 2000. He began working shortly after being hired, and officially became president on May 1, 2000. (Pl. L.R. 56.1 ¶ 3.) At the suggestion of Schueppert, Temes gave Mantia the position of Director of Programs for schools in spring 2000. (Pl. L.R. 56.1 ¶ 25.) Temes told Mantia that the position should pull together the other departments to focus on long-term projects and products that were going to increase the presence and impact of the JGB program in schools. (Pl. L.R. 56.1 ¶ 30.) However, Temes did not provide Mantia with a job description for the new position and never asked her to develop a job description. (Pl. L.R. 56.1 ¶ 29.) In June 2000, Mantia asked Temes if they could meet weekly. Although he agreed, they met only once or twice. After that, Temes did not make himself available for such meetings with Mantia. (Pl. L.R. 56.1 ¶ 31.)

During Mantia's tenure as Director of Programs for Schools, Mantia was involved with a number of programs. (Pl. L.R. 56.1 ¶ 32.) At the request of Temes, Mantia provided Temes with a self-assessment on October 31, 2000. (Pl. L.R. 56.1 ¶ 33.) In his response to Mantia's self-assessment on December 27, 2000, Temes acknowledged the "wide range of important work you have been doing." (Pl. L.R. 56.1 ¶ 36.) Temes stated that "the opportunity is before you to become the organizing principle, the central point, in sales, training, editorial & all else, as it all relates to schools." (Pl. L.R. 56.1 ¶ 36.) Temes later described Mantia as "very intelligent, very knowledgeable about what we did in schools, very articulate," "a person of great substance," and a "world class public speaker." Temes complimented her passion, energy, and enthusiasm for

4

TGBF's mission, and he noted her generosity and "team spirit." (Pl. L.R. 56.1 ¶ 40.) In January 2001, Temes approached Mantia to discuss the possibility of promoting her to Vice President of Sales and Marketing. (Pl. L.R. 56.1 ¶ 38.) At no time did Temes put Mantia on probation or give her any written warnings about her performance. (Pl. L.R. 56.1 ¶ 39.)

Several employees praised Mantia's work at TGBF, stating that Mantia was "incapable of giving any less than her best to anything she does," "helpful in getting people from different parts of the organization to work together," and "professional and gracious under pressure," that she had "invaluable . . . enthusiasm for GBF and commitment to understanding and responding to the way teachers actually use the program," and that her ideas were "for the most part dead on." (Pl. L.R. 56.1 ¶ 13-17.)

## C. Events Surrounding Termination

During fall 2000 and winter 2001, Mantia's mother was ill and her situation was unstable. She was seventy-seven years old and her diagnoses included Alzheimer's disease, senile dementia, and severe vascular degeneration. (Pl. L.R. 56.1 ¶ 42.) Temes was aware of Mantia's mother's condition. (Pl. L.R. 56.1 ¶ 44.)

On January 18, 2001, TGBF held a monthly meeting of a group Temes called the "directorate," which included Mantia. (Pl. L.R. 56.1 ¶ 41, 47.) Mantia, Temes, Joe Coulson, Victoria Crawford, Steve Craig, Janice Cody, and Garth Katner attended. (Pl. L.R. 56.1 ¶ 47.) Before the meeting, Mantia told Temes that she would have to leave before it was over to make a phone call. (Pl. L.R. 56.1 ¶ 48.) Mantia needed to speak to one of the health care providers responsible for her mother's long-term care. Whether Mantia told Temes the reason she needed to make the call is in dispute. It was possible to speak to the provider only by scheduling an

appointment, and the only appointment Mantia could get was in the late morning of January 18, 2001. (*Id.*) Either before or at the beginning of the meeting, Mantia distributed a written status report about some of her projects. (*Id.*) When it was time for her to make the phone call, Mantia stood up, reminded Temes why she was leaving, and quietly left the room.[2] (Pl. L.R. 56.1 ¶ 50.)

Mantia had to leave the office to make the phone call because TGBF was having phone problems and Mantia was unable to get an outside line from the TGBF office. (Pl. L.R. 56.1 ¶ 55.) During the phone call, the health care provider recommended to Mantia that her mother be institutionalized. (Pl. L.R. 56.1 ¶ 57.) Mantia was very upset by the phone call and decided to go home for the remainder of the day to consider how to handle her mother's situation. (Pl. L.R. 56.1 ¶ 58.)

Before going home, Mantia tried to call Temes but did not get through to him. She then called Joe Coulson, who was Temes' chief of staff. (Pl. L.R. 56.1 ¶ 59.) During that conversation, Mantia told Coulson that she "had a lot to work through." She did not offer Coulson any information about her mother "because she did not feel ready to speak about her," but she did not deny that she was upset about her mother.[3] (Pl. L.R. 56.1 ¶ 59.) She did not describe in any specific way the cause of her upset. (Def. Ex. 6.) Mantia told Coulson that she

---

[2]TGBF denies that Mantia "reminded" Temes that she had to make a call, arguing that Mantia "certainly did not 'remind' him as she never told him she was leaving in the first place." TGBF argues further that the depositions of Coulson and Katner do not support the allegation. (Def. Resp. to Pl. L.R. 56.1 ¶ 50.) The Court accepts as true, as it must, Mantia's statement that she told Temes before the meeting that she had to leave the meeting early to make a phone call. Furthermore, while the depositions of Coulson and Katner do not support Mantia's version of the facts, they do not contradict Mantia's version either. Katner testified only that Mantia left "fairly quietly," while Coulson testified that he was not paying attention to Mantia when she left. (Katner Dep. 165; Coulson Dep. 230-31.) Even Temes allows that Mantia "may have said, I'm gonna go make a phone call." (Temes Dep. 192.) Thus, the Court accepts Mantia's statement that she reminded Temes that she was leaving the meeting to make a phone call.

[3]TGBF argues that, in her telephone conversation with Coulson, Mantia denied that she left the meeting because of her mother. However, Coulson stated in his deposition only that Mantia "did not offer any information" about her mother. (Coulson Dep. 265; *see also* Def. Ex. 6.) This is not a denial.

6

did not think that afternoon was the right time for her to speak with Temes because she had heard from colleagues that Temes was soliciting negative information about Mantia. (Pl. L.R. 56.1 ¶ 59.) Mantia may also have mentioned to Coulson something about contacting a board member.[4] Mantia claims that she was considering approaching board member Schueppert or Jane Hunt to "discuss her options." (Pl. L.R. 56.1 ¶ 61.) Coulson told Temes that Mantia said she left the meeting because she was upset about an accumulation of things including Temes' dissatisfaction with her performance and because if she did not leave she might resign. (Def. L.R. 56.1 ¶ 11.) Mantia asked Coulson to let Temes know that she would call him the next day. (Pl. L.R. 56.1 ¶ 59.)

Mantia was nervous about approaching Temes to ask for some flexibility to help her manage her mother's care because Temes had been "unsympathetic and dismissive" during previous conversations regarding Mantia's mother. (Pl. L.R. 56.1 ¶ 44, 58.) She was also nervous about approaching Temes because she had heard from colleagues that Temes was soliciting negative information about Mantia. Mantia stayed home the following day, January 19, 2001, for the same reason. (Pl. L.R. 56.1 ¶ 58.) During this period, several employees worked from home. (Ahlquist Dep. 121.) Temes also stated that taking time off to manage an ill parent's care was appropriate. (Temes Dep. 251.)

Temes terminated Mantia's employment on January 19, 2001. (Def. L.R. 56.1 ¶ 14.) Temes replaced Mantia with Bill Siegel, who was 38-years old. (Pl. L.R. 56.1 ¶ 71.) TGBF states that it terminated Mantia because she was unsuccessful in her position as Director of

---

[4]TGBF suggests that Mantia threatened to *complain* about Temes to a board member during her conversation with Coulson. (Def. L.R. 56.1 ¶ 12; Def. Resp. to Pl. L.R. 56.1 ¶ 59.) There is nothing in the record to support this claim.

7

Programs for Schools, she did not appear to develop or maintain positive working relationships with her co-workers, and she was seen as difficult to work with. TGBF also states that Mantia was perceived as tending to withdraw herself from involvement in projects, avoiding contact with her supervisors and co-workers when work became demanding or challenging. For example, Temes cited Mantia's lack of enthusiasm for the "JGB Trek"–a town-to-town walk in New England–as evidence of her "tendency to withdraw from responsibility." (Temes Dep. 423) TGBF explains that Mantia's leaving the January 18, 2001, meeting was the "final straw" leading to her termination. (Def. Brief at 15.) Temes claimed that Mantia "stormed out" of the meeting. (Temes Dep. 84.) TGBF explains further that Mantia "left the office without explanation, did not show up for work the next day, did not offer any satisfactory explanation for her behavior, and in fact offered contradictory and inconsistent explanations for her behavior" to Coulson. (Def. Ex. 2.) TGBF also explains that Temes believed that Mantia contacted or planned to contact one or more board members behind his back. (Def. L.R. 56.1 ¶ 12.)

After Temes fired Mantia, at least fourteen employees called Mantia to express their dismay and support. At least four others sent messages to Mantia. (Pl. L.R. 56.1 ¶ 72.) Two employees told Temes that he made a mistake in firing Mantia. (Pl. L.R. 56.1 ¶ 73.)

**D. Other Relevant Events**

1. In May or June 2000, Temes had a conversation with Dan Wall, then Director of Sales and about 48 years old, about one of TGBF's sales representatives, Valentina Texera-Parissi, who was then in her twenties. Temes told Wall that he wanted to add to Texera-Parissi's responsibilities by involving her in a new project. Wall told Temes that Texera-Parissi's direct supervisor had some misgivings about her work, and Wall told Temes that he was uncertain "that

8

she had the maturity at that point to take on additional responsibility." Temes responded, "I prefer younger people in positions of responsibility," and he subsequently gave Texera-Parissi the additional responsibilities.(Pl. L.R. 56.1 ¶ 75.)

2. In the summer or fall of 2000, Temes attended a meeting at a school to discuss funding a Great Books program at the school. Margo Criscuola, TGBF's director of research, and Morris Kaplan, a TGBF board member in his eighties, also attended. The meeting did not go well. After the meeting, Temes complained to Criscuola that Kaplan was "too old to be a reliable person for us to work with." (Pl. L.R. 56.1 ¶ 77; Criscuola Dep. 121.)

3. On January 9, 2001, at a meeting of high-level TGBF managers, Temes complained about "dead wood"–staff and board members who "had been around too long." He said he had a list of such staff members, and he said there was too much "tired old blood" on the board. (Pl. L.R. 56.1 ¶ 78.)

4. At the same January 9, 2001, meeting, Temes said something which angered 43-year old Coulson. Coulson stormed out of the room, saying "this really pisses me off." Temes did not fire or discipline Coulson. Instead, Temes apologized to Coulson immediately. (Pl. L.R. 56.1 ¶ 83.)

5. On January 10, 2001, just over a week before Temes fired Mantia, Temes called Mantia an "old educationalist." When Mantia asked what he meant, Temes replied "It's a slur on both counts." (Pl. L.R. 56.1 ¶ 76.)

6. Thirty-eight year old Siegel was Director of Special Initiatives before Temes promoted him into Mantia's former position. Describing the work Siegel did in that position, Temes stated, "I don't think he took any large implementation to fruition. . . . We didn't have the results

I would have hoped for." (Temes Dep. 153-54.) On January 6, 2001, Temes raised with Siegel the possibility of combining his job with Mantia's, in part to help Siegel "score the big engagements"–contracts with large schools districts–that had so far eluded him. (Pl. L.R. 56.1 ¶ 126.)

7. When Siegel replaced Mantia as Director of Programs for Schools, Siegel expressed reservations about the JGB Trek to Temes. Temes promptly cancelled the project. (Temes Dep. 424; Siegel Dep. 162-65.)

## DISCUSSION

A plaintiff may establish age discrimination under the ADEA through direct or indirect proof. *Huff* v. *UARCO, Inc.*, 122 F.3d 374, 379 (7th Cir. 1997). Mantia relies on the indirect method of proof. Under this method, the plaintiff bears the initial burden of producing evidence to sustain a *prima facie* case. If the plaintiff meets this burden, the employer must then produce a legitimate, non-discriminatory reason for his action. If the employer offers a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff to present evidence that the employer's proffered reason is pretextual. *Johnson* v. *Zema Systems Corp.*, 170 F.3d 734, 742 (7th Cir. 1999).

1.  *Prima facie case*

To establish a *prima facie* case, Mantia must present evidence to show that there is a triable issue of fact on each of the following elements: (1) she was over forty; (2) she reasonably performed to her employers expectations; (3) she was terminated; and, (4) she was replaced by someone substantially younger. *Lesch* v. *Crown Cork & Seal Co.*, 282 F.3d 467, 472 (7th Cir.

2002). TGBF contends that Mantia has failed to establish the second and fourth elements of her *prima facie* case.

TGBF argues that Mantia was not performing up to TGBF's legitimate expectations and thus fails to establish the second element of her *prima facie* case. TGBF points to Temes' claim that Mantia was failing at her job and had poisoned relationships with other TGBF employees that precluded her from building the collaboration among departments that was crucial to her job. Further, TGBF argues that Mantia "stormed out" of the January 18, 2001, meeting without making her presentation, left the office without telling anyone, did not come to work the following day, and offered no satisfactory explanation for her behavior.

However, to establish a *prima facie* case, Mantia bears the burden of producing "some evidence" that she was performing her job satisfactorily. *Johnson*, 170 F.3d at 743. Mantia has met this burden. Letvin's 1998 performance evaluation of Mantia described Mantia's work as "outstanding." TGBF argues correctly that "earlier evaluations cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken." *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545 (7th Cir. 2002). But Mantia does not rely solely on the previous performance evaluation. She also points out that Temes had never put her on probation or ever given her any written warnings about her performance, that he had acknowledged the "wide range of important work" she was doing, noted her generosity and "team spirit," and that he even discussed promoting her just days before firing her. She also points to numerous statements by her co-workers complimenting her job performance. Again, TGBF is correct that "a co-worker's general statements about a plaintiff's job performance are insufficient to create a genuine issue of material fact as to the plaintiff's

11

performance." *Arres* v. *IMI Cornelius Remcor, Inc.*, No. 00 C 6542, 2002 WL 1888489 at *4 (N.D. Ill. Aug. 15, 2002). But insufficient does not mean irrelevant. Taken together, the evidence Mantia presents raises a genuine issue of material fact as to whether Mantia was performing her job satisfactorily.

TGBF also argues that Mantia has failed to establish the fourth elements of her *prima facie* case because she cannot establish that TGBF treated *similarly situated* younger employees more favorably than Mantia. However, TGBF misstates the fourth element of the *prima facie* case. Because this is a single-discharge case, Mantia must show only that she was replaced by a substantially younger employee. "The plaintiff in a single-discharge case does not need to make an initial showing that 'similarly situated' employees were treated better because the inference of discrimination arises from that fact that they were . . . 'replaced' by workers outside the protected class." *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 495 (7th Cir. 2000). Mantia was replaced by 38-year old Bill Siegel. Thus, she has satisfied the fourth element of her *prima facie* case.

2.  *Legitimate, nondiscriminatory reason*

Because Mantia has established a *prima facie* case of age discrimination, TGBF next carries the burden of articulating a legitimate, nondiscriminatory reason for firing Mantia. *Johnson*, 170 F.3d at 742. TGBF has articulated several legitimate, nondiscriminatory reasons for firing Mantia. TGBF states that it terminated Mantia because she was unsuccessful in her position as Director of Programs for Schools, she did not appear to develop or maintain positive working relationships with her co-workers, and she was seen as difficult to work with. Moreover, TGBF contends that Mantia was perceived as tending to withdraw herself from involvement in projects, avoiding contact with her supervisors and co-workers when work

12

became demanding or challenging. TGBF points specifically to Mantia's leaving the January 18, 2001, meeting. Temes claimed that Mantia "stormed out" of the meeting. TGBF explains further that Mantia "left the office without explanation, did not show up for work the next day, did not offer any satisfactory explanation for her behavior, and in fact offered contradictory and inconsistent explanations for her behavior" to Coulson. Because these reasons are facially legitimate, the burden reverts to Mantia to show that they are a pretext for age discrimination. *Johnson*, 170 F.3d at 742.

3.    *Pretext*

Mantia can establish that TGBF's reasons for terminating her are pretextual by showing "that the company's proffered reasons were not the sole determining factors and, therefore, age discrimination might have been a determining factor in addition to the proffered reasons." *Kralman* v. *Illinois Dept. of Veterans Affairs*, 23 F.3d 150, 156 (7th Cir. 1994). No one piece of evidence need support a finding that age was a determining factor, but rather the court must take the facts as a whole. *Huff*, 122 F.3d at 385. One way Mantia may show pretext is "by showing that a younger worker was treated better than an older worker who was qualified to do the work in question." *Blackwell* v. *Cole Taylor Bank*, 152 F.3d 666, 672 (7th Cir. 1998). Mantia has produced exactly this kind of evidence. On January 9, 2001, 43-year old Coulson stormed out of an office meeting saying "that really pisses me off." Temes immediately apologized to Coulson. Only a few days later, Mantia quietly left a meeting, after having told Temes before the meeting that she had to leave to make a phone call. Temes fired her the next day, pointing to her departure from the meeting as one of the reasons. Regarding Siegel's work as Director of Special Initiatives, Temes stated, "I don't think he took any large implementation to fruition. . . .

13

We didn't have the results I would have hoped for." Yet Temes gave Siegel Mantia's job after she was terminated for "being unsuccessful in her position as Director of Programs for Schools." Temes also cites Mantia's lack of enthusiasm for the "JGB Trek"–a town-to-town walk in New England–as evidence of her "tendency to withdraw from responsibility." Yet when Siegel expressed similar reservations about the JGB Trek, Temes cancelled the project. This evidence raises a genuine issue of material fact as to whether the reasons that TGBF gave for Mantia's discharge are pretextual.

But this is not the only evidence of pretext that Mantia has presented. More important are the remarks of Temes indicating age bias. An employer's discriminatory remarks, when considered in conjunction with other evidence, can support an inference of discriminatory intent under the indirect method of proving age discrimination. *Huff*, 122 F.3d at 385; *Futrell* v. *J.I. Case*, 38 F.3d 342 (7th Cir. 1994)(Discriminatory statements "may suffice to present a prima facie case . . . and may indeed persuade the factfinder that the plaintiff has carried his or her ultimate burden of persuasion."). Mantia has alleged, and on summary judgment the court must accept as true, that Temes made remarks evincing age bias on four occasions. In May or June of 2000, Temes stated that he "prefer[s] younger people in positions of responsibility." In the summer or fall of 2000, Temes stated that a board member was "too old to be a reliable person for us to work with." On January 9, 2001, Temes complained about "dead wood"–staff and board members who "had been around too long." He said there was too much "tired old blood" on the board. Finally, on January 10, 2001, just over a week before Temes fired Mantia, Temes called Mantia an "old educationalist." When Mantia asked what he meant, Temes replied "It's a slur on both counts." TGBF argues that these statements "do not hint at age bias." Although the court
14

suggests something considerably more than a hint of age bias can be inferred from these statements, the issue is one for the jury, for, as the Seventh Circuit has stated, the "task of disambiguating ambiguous utterances is for trial, not for summary judgment." *Shager v. Upjohn Co.*, 913 F.2d 398, 402 (7th Cir. 1990).

TGBF also argues that the remarks do not show pretext because they did not directly relate to Mantia's termination. This argument would be fatal to Mantia's discrimination claim if she were using the direct method of proof. *See Fuka v. Thomson Consumer Electronics*, 82 F.3d 1397, 1403 (7th Cir. 1996)(holding that in a direct proof case, plaintiff must show that remarks were related to the employment decision in question). However, the Seventh Circuit has stated that discriminatory statements need not be directly related to the employment decision in question to be probative of discriminatory intent in an indirect proof case. *Huff*, 122 F.3d at 385. A jury should decide if Temes' stated preference for younger workers, his self-proclaimed "slur" that Mantia was an "old educationalist," and his comments about older board members show that his decision to fire Mantia was motivated by age discrimination.

Finally, Temes states that he decided to fire Mantia after she "stormed out" of the January 18 meeting. He stated, "from the moment she walked out of the room . . . it just was like shutting a book." (Temes Dep. 202.) However, no one else present at the meeting suggests that Mantia "stormed out." Coulson and Katner say she left quietly. Furthermore, Mantia claims that she told Temes that she was leaving the meeting to make a phone call both before the meeting and just before she left the meeting. Because we must credit Mantia's version of the January 19 meeting, Temes' statements about the event and its role in his decision to terminate Mantia undermine the plausibility of supposing that his decision was based on non-discriminatory

15

motives. Similarly, Temes specifically cites Mantia's lack of enthusiasm for the JGB Trek as one of the reasons for discharging her. Yet when Siegel expressed similar doubts about the project, Temes cancelled it. This also raises doubts about Temes' reasons for discharging Mantia. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000).

Taken together, Mantia's evidence that TGBF treated younger employees better than her, that Temes made several comments that could be construed to show age-bias, and that some of TGBF's proffered reasons for firing her are unworthy of credence establish a genuine issue of material fact regarding TGBF's actual motives in firing Mantia.

**ORDER**

Wherefore, for the reasons stated above, TGBF's motion for summary judgment is denied (#30). Trial is set for January 26, 2004 at 10:00 a.m. Final pretrial materials shall be submitted to chambers not later than November 1, 2003, and a final pretrial conference will be held on January 16, 2004 at 4:00 p.m. In the meantime, the parties are referred to the designated magistrate judge for a settlement conference.

Enter: *[signature]*
JOAN HUMPHREY LEFKOW
United States District Judge

Date: September 17, 2003